THE STATE OF DELAWARE, *ex rel.* Percy Warren Green, Attorney-General, *v.* NORMAN COLLISON, JAMES H. LATCHUM and CLARENCE E. GRACE.

*(February* 16, 1938.)

LAYTON, C. J., RODNEY and SPEAKMAN, J. J., sitting.

*P. Warren Green,* Attorney-General, *James R. Morford* and *H. Albert Young* for relator.

*Hugh M. Morris, S. Samuel Arsht,* and *James M Tunnell* for respondents, Norman Collison and James H. Latchum.

*Josiah Marvel, Jr.,* and *E. Ennalls Berl* for respondent, Clarence E. Grace.

Superior Court for New Castle County, No. 267, September Term, 1937.

LAYTON, C. J., delivering the opinion of the majority of the court:

Two questions are presented for determination: One, the constitutional question whether there is a limitation on the legislative power with respect to removals from public offices created by statute; the other, a question of statutory construction.

■■ It is agreed that a State Constitution operates not as a grant of power to the Legislature, but as a limitation of power; that all power, which is not limited by the Constitution, inheres in the people who declare their will through the Legislature. Accordingly, an unlimited power is vested in the Legislature of a state to enact all such laws as it may consider necessary and proper, except where limitations have been imposed by the Federal or State Constitutions.

■■ The power of the Legislature may be restrained by express limitation, or by restrictions impliedly imposed; and restrictions in a Constitution with respect to legislative power are equally effective whether they arise by implication, or are stated in express terms. Such restrictions may be found either in the language employed, or in the evident purpose which was in view and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law. *State v. Fox,* 158 *Ind.* 126, 63 *N. E.* 19, 56 *L. R. A.* 893; *Page v. Allen,* 58 *Pa.* 338, 98 *Am. Dec.* 272; 11 *Am. Jur.* 898; *Rathbone v. Wirth,* 150 *N. Y.* 459, 45 *N. E.* 15, 34 *L. R. A.* 408, opinion of O'Brien, J.

Having in mind this fundamental principle, it is to be determined whether the several provisions of the Constitution of this state relative to removals of public officers from office, operate as a limitation on the legislative power to enact laws authorizing removals outside of the purview of the constitutional provisions.

Before the Revolution, an unlimited power of removal from office by the executives of the colonial governments

was considered a great evil from which the colonists had suffered. In the charter of Delaware in 1701, the freemen of the respective counties were empowered to "chuse a double Number of Persons to present to the Governor for Sheriffs and Coroners, to serve for Three Years, if so long they behave themselves well." In 1724, Mrs Hannah Penn, in her instructions to Sir William Keith, Governor of Pennsyvania, protested against his dismissal of the secretary without seeking the advice of his council. In New Hampshire, the later commissions of government were accompanied with instructions requiring either that removals from office be made only upon good and sufficient cause, or upon cause signified to the home government in the fullest and most distinct manner. In Virginia, similar instructions accompanied the issuance of commissions to Governor Howard in 1683, and to Governor Dunmore in 1771. Mr. Justice Brandeis, in his dissenting opinion in *Myers v. U. S.*, 272 *U. S.* 52, 47 *S. Ct.* 21, 84, 71 *L. Ed.* 160, makes the assertion that an uncontrollable power of removable in the Chief Executive "had been denied in the thirteen states before the framing of the federal *Constitution*," and that, "The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power."

We, therefore, are prepared to find that the first constitution of 1776 provided that the public officers, both State and County, appointed by the president and privy council, should be commissioned and remain in office during five years if they should behave themselves well; that upon impeachment, if found guilty of "maladministration, corruption, or other means, by which the safety of the Commonwealth may be endangered," a permissible penalty was removal from office *pro tempore*; and that, "all officers shall be removed on conviction of misbehavior at common law,

or on impeachment, or upon the address of the general assembly." *Const.* 1776, *Art.* 23.

Some of the able members of the convention that framed the *Constitution of* 1792 may be supposed to have had acquaintance with the fierce controversy that raged in the first session of the Federal Congress in 1789 with respect to the power of removal from office by the President. It was during the celebrated debates now to be mentioned that Representative White said that an uncontrollable power of removal in the Chief Executive was "a doctrine not to be learned in American Governments."

The bill that aroused the controversy was concerned with the creation of the office of chief clerk in the State Department, in which bill there was a provision giving the President authority to remove incumbents of the office. The Federal Constitution contains no direct provision for the power to remove federal officers, and as a result, at that first session, there began a controversy, which has been continuous, as to where, with reference to specific officers or classes of officers, this power of removal is constitutionally vested, or where it may be vested by statute. *Willoughby Const. Law,* § 670.

In *Myers v. U. S., supra,* the several opinions examine at length the historical, legislative and judicial data bearing on the question.

It was objected by members of the House of Representatives, among whom was Mr. Vining of Delaware, that as the Constitution was silent with respect to the presidential power to effect removals from office, it should be construed to confer that power as necessary adjunct to his duty and responsibility to enforce the laws, and that it should apply except with respect to the judges holding their offices under the Constitution during good behavior. Consequently, the provision of the bill was unnecessary and misleading as it might be construed as a grant of power. The bill passed

the house by a vote of 29 to 22. In the Senate it was carried by the casting vote of the Vice President. Mr. Justice Story, 2 *Story Const.*, § 1543, says, that the final decision of this question so made was greatly influenced by the exalted character of the President then in office, was asserted at the time, and has always been believed. Chancellor Kent, 1 *Kent Comm.* 310, *Lecture* 14, observes that the construction given to the Constitution in 1789 has continued to rest on this loose, incidental and declaratory opinion of Congress. Speaking for the majority of the court in the Myers Case, Chief Justice Taft said that the vote was, and was intended to be, a legislative declaration that the power to remove officers, appointed by the President and the Senate, vested in the President alone, and that, until the Johnson impeachment trial in 1868, its meaning was not doubted even by those who questioned its soundness. That many did question the soundness of the doctrine is well known. Mr. Justice Story, *supra*, states that the doctrine was opposed, as well as supported, by the highest talents and patriotism of the country. Mr. Webster opposed an uncontrollable power of removal as one tending to "turn the whole body of public officers into partisans, dependents, favorites, sycophants, and man-worshippers." Mr. Clay and Mr. Calhoun appear to have denied the so-called "congressional construction." See dissenting opinion of Mr. Justice McReynolds in *Myers v. U. S., supra.* In *McAllister v. U. S.*, 141 *U. S.* 174, 11 *S. Ct.* 949, 35 *L. Ed.* 693, Mr. Justice Field, Mr. Justice Gray and Mr. Justice Brown repudiated the doctrine of unlimited power. The dissenting opinions of Mr. Justice McReynolds, Mr. Justice Brandeis and Mr. Justice Holmes in the Myers Case show the bitterness of the conflict of opinion that began in 1789, and the unanimous opinion in *Humphrey's Ex'r v. U. S.*, 295 *U. S.* 602, 55 *S. Ct.* 869, 79 *L. Ed.* 1611, denies the sweep of the language of the opinion of the majority of the court in the

Myers Case. Moreover, it was never doubted that the right to appoint federal judges does not carry with it the right to remove, since it is elsewhere specifically provided in the *Constitution* that they shall hold office during good behavior.

By the *Constitution of* 1792, the office of Chief Executive was created under the title of Governor. Adhering to the philosophy of the first Constitution with respect to removals from office, the Governor was empowered to "appoint all officers whose offices are established by this constitution or shall be established by law, and whose appointments are not herein otherwise provided for." *Article 3, §* 8. It was provided that the chancellor and the judges of the Supreme Court and of the court of common pleas, "shall hold their offices during good behavior; but, for any reasonable cause which shall not be a sufficient ground for an impeachment, the governor may, in his discretion, remove any of them, on the address of two-thirds of all the members of each branch of the legislature." *Article 6, § 2.*

By a separate provision, the Governor was empowered to appoint justices of the peace, "who shall be commissioned for seven years, if so long they shall behave themselves well; but may be removed by the governor within that time on conviction of misbehavior in office, or on the address of both houses of the legislature." *Article 6, § 20.*

Again by separate provision, "The attorney-general, clerks of the supreme court, prothonotaries, registers, clerks of the orphans' courts and of the peace, shall respectively be commissioned for five years, if so long they shall behave themselves well; but may be removed by the governor within that time, on conviction of misbehavior in office, or on the address of both houses of the legislature." *Article 8, § 5.*

The office of state treasurer was created, to be appointed annually by the House of Representatives, with the concurrence of the Senate.

Sheriffs and coroners were made elective officers, to hold office for three years, if so long they behaved themselves well, and until their successors were duly qualified.

The office of secretary was created by the *Constitution of 1776, Article 12*, the incumbent "to remain in office during five years, if [he] behave [himself] well." By the *Constitution of 1792*, it was provided that a secretary "shall be appointed and commissioned during the governor's continuance in office, if he shall so long behave himself well." *Article 3, § 15*.

The Governor, and all other civil officers were made liable to impeachment for treason, bribery, or any high crime or misdemeanor in office.

The provisions relating to appointments to office, and removals therefrom, were carried into the Constitution of 1831, but with the safeguarding provision with respect to removals of judges on the address of the Legislature, that the cause of removal be entered on the journal of each house and that the judge have notice accompanied with the cause alleged for his removal at least five days before action thereon by either house.

It is to be noted that, under the *Constitution of 1776*, the only public officers elected by the people were members of the General Assembly, sheriffs and coroners. The office of Governor was made elective by the people under the *Constitution* of 1792; but his power of appointment to office was not conditioned upon the approval of the Senate either by the *Constitution of 1792* or by that of 1831.

By the *Constitution of 1897*, the power of the Governor was greatly limited and circumscribed. The Attorney-General, the state treasurer, the state auditor, the insurance

commissioner, the prothonotaries, the clerks of the peace, the registers of wills and the recorders of deeds were made elective officers. The Governor's power of appointment to office, where the salary, fees or emoluments of the office should exceed the sum of five hundred dollars annually, was conditioned upon the approval of a majority of all members elected to the Senate. He was authorized to fill all vacancies in offices as to which he was given the power of appointment, except the chancellor, chief justice and associate judges, that might happen during the recess of the Senate, by granting commissions "which shall expire at the end of the next session of the Senate." *Article* 3, § 9.

The impeachment provisions were not changed. The discretionary power of removal from office by the Governor upon the address of the Legislature was made applicable to "any officer," except the Lieutenant Governor and members of the General Assembly, but with the requirements of a two-thirds vote of all its members elected to each house, of entry of the cause of removal on the journal of each house, and of notice accompanied with the cause alleged for removal of at least ten days before action thereon by either house.

*Section* 6 of *Article* 15 was given careful consideration by the convention. Fully one-half of the members were lawyers, some of them the foremost members of the Delaware Bar. See opinion of *Grubb, J.,* in *State v. Churchman,* 3 *Penn.* 361, at *page* 386, 51 *A.* 49. The debate thereupon was led by William C. Spruance, who later served as associate judge with outstanding learning and ability, and was participated in by Edward G. Bradford, afterwards a distinguished judge of the United States District Court for the District of Delaware. Constitutional debates manifesting more directly purpose and policy are seldom found. The proceedings disclose that the section was substantially the first sentence of *Section* 4 of *Article* 6 of the *Constitution of*

1874 of *Pennsylvania*, reading as follows: "All officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed officers, other than judges of the courts of record and the Superintendent of Public Instruction, may be removed at the pleasure of the power by which they shall have been appointed. All officers elected by the people, except Governor, Lieutenant Governor, members of the General Assembly and judges of the courts of record learned in the law, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate."

As first proposed, the section read, "all officers shall hold their offices on condition that they behave themselves well, and shall be removed by the Governor on conviction of misbehavior in office or of any infamous crime." At the suggestion of Judge Bradford the sentence was altered so as to make two substantive provisions, and as adopted, it reads, "All public officers shall hold their offices on condition that they behave themselves well. The Governor shall remove from office any public officer convicted of misbehavior in office or of any infamous crime."

In the course of the discussion of the section as it was at first presented before the committee of the whole, Judge Spruance said:

"That needs just one word of explanation. There are three ways of getting rid of an officer. One is, under these lines, on misbehavior in office, or any infamous crime, and the Governor shall remove that man, because it is his duty to do so. That means where he has been convicted on indictment of misbehavior in office or infamous crime. The next deals with removal on the address of the legislature; and then we have the third one, that of impeachment."

"I find this provision in the *Constitution of Pennsylvania* and it is a good safe one. Of course, a man does not want his day in Court, because he has had his day in Court, and he has been indicted and he has been convicted. That being so, he certainly ought to come out of office and the Governor ought certainly to remove him."

"There is only one thing more that I want to call your attention to and that is this, the presence of these words here, 'shall hold their offices on condition that they behave themselves well while in office.' Those words being there may enable us to strike out similar words that we have used repeatedly through the *Constitution*, as for instance, a judge should hold his office for twelve years if he shall so long behave himself while he is in office; and in several other places."

"I want to show the gentleman a corresponding provision in the *Pennsylvania Constitution*. It says, that all officers shall hold their offices on condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or any infamous crime."

"That is substantially the same as we have here, except we say who shall do it; that the Governor shall remove on conviction."

"And again, that the appointed officers other than the judges of a court of record and the superintendent of public instruction may be removed at the pleasure of the power by which they shall have been appointed."

"That seems to be without any cause at all. Of course, we do not want that."

On May 11, 1897, the convention considered the section as contained in the report of the committee on phraseology and arrangement, and during the discussion Judge Spruance said:

"The next question is, by what methods, as provided in this proposed Constitution, can a man be turned out? Is this the only one mentioned in that Section? Oh, no. I think not."

"All public officers shall hold their offices on condition that they behave themselves well, and shall be removed by the Governor on conviction of misbehavior in office or of any infamous crime. That is one way of doing it."

"That means, as I understand, conviction in some criminal court of misbehavior in office, as for instance, of bribery in office, or of other corrupt conduct in office for which we have many statutes to meet the various cases; or it might be the case of a crime not connected with the office at all, as for instance, a man may be convicted of a crime which by law is recognized as infamous crime, as larceny, or robbery, or any of those crimes. There would be no difficulty in discovering what were infamous crimes, and those in that connection are disconnected, or, at all events, they have no necessary connection with behavior in office. There are infamous crimes. That is so. But there are other ways of getting rid of public officers. As for instance, we turn to the provision on impeachment and treason (*page* 80). There is a provision that the House of Representatives shall

have the sole power of impeaching, the cause to be tried by the Senate."

"And then again in *Section* 11 of that same *Article,* you find that the Governor and all other civil officers under this State shall be liable to impeachment for treason, bribery, or any high crime or misdemeanor in office. Judgment in such cases shall not extend further than to removal from office, and disqualification to hold any office of honor, trust, or profit, under this State; but the party convicted shall, never the less, be subjected to indictment, trial, judgment and punishment according to law."

"In the case of impeachment, I think that a removal from office is always the penalty. Whatever else there may be as a penalty, aside from removal from office on conviction of impeachment, there is always that judgment of removal from office. That is one way."

"Turn to *Section* 14, and you find another way, and that may or may not be for offenses committed in office, or for crimes not connected with the office, or for no crime at all, but for mere misfortune, for mere incapacity, or for unseemly conduct which does not reach a degree of crime of any sort, but more particularly, probably, would be applied to cases of mental or physical disability. The Governor may for any reasonable cause remove any officer, except the Lieutenant Governor and members of the General Assembly, upon the address of two-thirds of all the members elected to each House of the General Assembly. Whenever the General Assembly shall so address the Governor, the cause of removal shall be entered on the journals of each House. The person against whom the General Assembly may be about to proceed shall receive notice thereof, accompanied with the cause alleged for his removal, at least ten days before the day on which either House of the General Assembly shall act thereon. (*Section* 14 of *Article* 111)."

"So there seem to be those three means by which a man may be gotten rid of. The *Section* which we now have under consideration is almost automatic in its operation. If a man is convicted of misbehavior in office under this *Section,* that is, of infamous crime, (although Misbehavior in office may not necessarily be an infamous crime) why, thereupon, no such conviction shall be had except in a Court. That is a court trial, and, of course, there can be no conviction unless the man has had his day in Court. He has had a regular trial in the due course of law, and he has been convicted, whether of misbehavior in office or of infamous crime. That is the end of him, so far as that office is concerned. It is immediately made the duty of the Governor to remove him from office. That is all of that."

"In case a man is impeached, of course an impeachment is always for some misconduct in office. That, I understand, is always the case for misconduct in office, of a greater or less degree. He has to appear before the Senate and the House of Representatives. If he is convicted, that *ipso facto* works a forfeiture of that office. He goes out of office. I think the judgment in the case of impeachment is always removal from office."

"We go to *Section* 14, and that is a case which may cover misbehavior in office, but more generally would cover the case of mental or physical incapacity; and then he is removed from office."

Judge Bradford thought that the language of the section could be improved so as to do away with whatever doubt there might be as to whether a conviction of misbehavior was not a condition preceding the removal of an officer; and in answer Judge Spruance said, "The Governor cannot remove, certainly, except a man be convicted here, unless it be upon the address of the General Assembly," to which Judge Bradford replied, "No, that is perfectly true."

The section laid on the table until May 20, 1897, when during the debate on the alteration of the section as proposed by Judge Bradford, Judge Spruance said:

"Mr. President, I am not particular about this thing. The point raised by the gentleman from Christiana (Mr. Bradford) was this. He wanted to know whether as that section stood, there was not danger that a public officer could not in any other manner be removed; that is, except he be convicted of misdemeanor in office, or other infamous crime."

"I thought not. I went on to show, if the gentleman from North Murderkill (Mr. Cooper) will give me his attention, that this was one of the causes of removal, towit, conviction of misdemeanor in office or of other infamous crime, that *ipso facto* the Governor would remove that man from office. But that there were other circumstances under which a man would just be removed, according to the conditions (and that is the reason we took out of another provision that the term should be so and so). We struck all that out and they were to stay so long as they should behave themselves well; and so that was the other circumstance under which he could be removed from office."

"Another method or condition under which a man may be removed from office is on the address of two-thirds of the General Assembly to the Governor. The Governor may then remove a man from office—not that he 'shall' but he 'may'. That might be a case in which a man had misbehaved himself in office or had become incompetent physically or mentally; then he might be removed from office. This was another case where a man had been convicted in court, whom the Governor shall remove *ipso facto*, because he had had his day in court."

"This might meet the views of those who think there should be a closer connection of the sentences, if we make the section read as follows: 'All public officers shall hold their offices on condition

that they behave themselves well. The Governor shall remove from office any public officer convicted of misbehavior in office or of any infamous crime.' "

The section as changed was then adopted.

The framers of the earlier Constitutions, among whom were men of learning and experience, of ability and foresight, well knew the "fury of democracy." They were acquainted with the evils that the colonists had suffered from the notorious abuses of power (see opinion of *O'Brien, J.,* in *Rathbone v. Wirth, supra*), and the evils arising from arbitrary removals from office. They were not inattentive to the sharp and bitter controversy which arose in the first Congress with respect to the presidential power of removal from office. They were actuated by the belief that an uncontrollable power of removal in the Chief Executive was "a doctrine not to be learned in American Governments." They believed "that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Ex'r v. U. S.*, 295 *U. S.* 602, 55 *S. Ct.* 869, 874, 79 *L. Ed.* 1611.

When, therefore, the several provisions of those Constitutions with respect to tenure of office during good behavior, whether the office be for life or for a term of years, are considered in the light of history, and regard is had for the causes and methods of removal carefully stated and re-stated with respect to judges, justices of the peace and other public officers, both state and county, there is clearly discoverable the purpose and policy to preclude by the organic laws the removal of public officers except as provided by those laws, this to ban the exercise of arbitrary power, and to make the public service a desirable field for competent persons to enter.

The present *Constitution* shows a steady adherence to purpose and principle. Its framers were actuated by the

same beliefs. They enlarged the causes of mandatory removals by including conviction of infamous crimes. They safeguarded discretionary removals upon the address of the Legislature by requiring a two-thirds vote in all cases, and by requiring a notice of ten days. The Governor and all civil officers under this state are liable to impeachment for treason, bribery or any high crime or misdemeanor in office, a certain penalty, upon conviction, being removal from office. The Governor is given the discretionary power to remove any officer, except the Lieutenant Governor and members of the General Assembly, upon the address of the Legislature; and he shall remove any public officer convicted of misbehavior in office or of any infamous crime. The general welfare and the rights of persons holding office are alike safeguarded. If it be said that the causes are insufficient and the methods to be employed are slow and cumbersome, and, therefore, detrimental to the public interests, the answer is that the framers of our organic laws weighed the disadvantages against the advantages, and were of the belief that it was necessary in the general public interest, to secure as far as possible competent persons to fill public offices by safeguarding them therein for the terms for which they were appointed, except as they might by wrongful conduct or by misfortune become unfit or incapacitated to hold them; and that an arbitrary power of removal should not be permitted.

For these weighty reasons, based upon experience, and with deliberation, certain causes of removal and certain methods of removal were provided as the sole causes and the sole methods. Removal by impeachment if for cause. Removal upon the address of the General Assembly is predicated on cause. Conviction of misbehavior in office or of infamous crime is cause. Every provision in the organic law with respect to removal from office points straight at

cause, and nothing except cause. If an officer behaves himself well while in office he gives no cause for his removal.

■ If the respondent's contention is sound, that the provisions of the *Constitution* with respect to removals from public office are not limitations on the legislative power, but that despite them, the Legislature still has the power to authorize the appointing power to effect removals from office for other causes or for no cause at all, then the constitutional provisions made applicable to all public officers are but empty phrases, and restraint upon the legislative power by implication is utterly denied. The result would be that, while the Legislature itself, under the express provision of the *Constitution,* may not even presume to address the Governor with respect to the desirability or necessity of removing a public officer except upon a two-thirds vote of all the members of each house, and, in that event, must enter upon their journals the cause alleged, and must give ten days to the officer of the cause and when each house will act thereon—all of which is to enable the officer to appear and defend himself against the alleged cause of removal— yet the Legislature may, by a bare majority, authorize the Governor to make removals, at least from appointive statutory offices, for no cause, or for other causes, and with no notice to appear and defend. If the contention is sound, then by general act applicable to all statutory offices, at least to appointive offices, the Governor may be empowered to effect removals from office at his pleasure. The power would be read into every act creating such office. It would limit the term of every such office, and the officers would hold at the Governor's will. It is the office of the organic law to protect the people against arbitrary power. Were it not for that consideration, Constitutions would have little place among civilized people.

■■ The several provisions of the *Constitution* are to be regarded as limitations and restrictions on the legis-

lative power with respect to removals from public offices; and the Legislature may not constitutionally empower the Governor to remove from public office, before the expiration of the statutory term, persons who have been appointed thereto, confirmed and commissioned, except for the causes and in the manner provided by the *Constitution*.

Counsel for the respondents call attention to many acts of Legislature creating offices with definite terms unless sooner removed by the Governor, or to serve at his pleasure, and to acts providing deputies for public officers' removal at the will of their superiors. With respect to the latter, little need be said. They are subordinate clerks and assistants with no fixed terms. With respect to the former instances, the Board of Examiners of Barbers was created in 1901. Its provisions apply to the city of Wilmington. The Board of Examiners of Undertakers was created in 1911; the Portrait Commission, if the members thereof can be called public officers as they have no salary or compensation and are required to give no bond, in 1913; the Board of Budget Directors in 1931. The original act creating the office of regulator of weights and measures, an office in a real sense and one of great age, provided for a fixed term with no power of removal. It was not until 1931 that the tenure was made at the pleasure of the Governor. It appears, then, from the instances cited, that the only offices created by the Legislature and made appointive by the Governor for a fixed term "unless sooner removed," are the members of the examining boards of undertakers and barbers. And, as said by Chief Justice Ames, in *Taylor v. Place*, 4 *R. I.* 324, if the unconstitutional exercise of power for so short a period were to weigh with the court in so plain a case, it must be upon the strange ground that an usurpation of power, in derogation of the *Constitution*, always, of itself, affords a constitutional justification for the usurpation.

There is presented a history of more than a century during which the Legislature never asserted the right to confer upon the Chief Executive of the government the power of removal of public officers. And, on the other hand, as evidencing the opinion and belief that the power of the Legislature with respect to removals from office was limited and restricted by the organic law, at the legislative session of 1917, the same session at which the act in question in its original form was passed, a bill proposing a constitutional amendment passed both houses of the Legislature by the required constitutional majority, conferring on the Governor, when the General Assembly was not in session, the power to remove for cause any officer appointed by him, except the chancellor and the five law judges, the officer so removed to receive a statement in writing of the cause of removal within ten days, and with the right of appeal for reinstatement to the superior court. This enactment, found in *Chapter 2, Vol. 29, Delaware Laws,* never became a part of the *Constitution;* but if the proposed amendment had been adopted, there would have been no departure from the principle embodied in all of our organic laws, for the proposed power of removal was founded on cause, and, as a safeguard against arbitrary removals, the superior court was given jurisdiction to order reinstatement of the officer unjustly removed.

The sole public office as to which the arbitrary power of removal is incidental is the office of secretary of state. By the first *Constitution* the term of this office was for five years "if he behave himself well." By the *Constitutions of* 1792 and 1831, the appointee was commissioned during the Governor's continuance in office, "if he shall so long behave himself well." By the present *Constitution,* mindful of the intimate and confidential relations that ought to exist between the Governor and the secretary of state, it was provided that the appointee "shall hold office during the pleas-

ure of the Governor." *Article* 3, § 10. This public officer is singled out as the one whom the Governor may remove at any time, and without cause. Of itself the instance is of little significance. Considered with the provisions with respect to removals of other public officers, it may not be ignored.

There is another provision of the *Constitution* that deserves consideration. By *Section* 9 of *Article* 3, the Governor is given power "to fill all vacancies that may happen during the recess of the Senate, in offices to which he may appoint, except in the offices of Chancellor, Chief Justice and Associate Judges, by granting Commissions which shall expire at the end of the next session of the Senate." Let this case be supposed: A vacancy exists in the Industrial Accident Board during a recess of the Senate. The Governor makes an appointment to fill the vacancy, and issues to his appointee a commission the expiry of which is at the end of the next session of the Senate. After entering upon his duties, but before the Legislature convenes, the Governor, under the supposed authority of the act, removes his appointee. The language of the constitutional provision, unless its meaning is other than plain language conveys, affords protection. If the Governor may remove his appointee where there is no vacancy except as the vacancy is created by his act of removal, may he, having created the vacancy, and having supplied it by issuing a commission during the Senate's recess, create another vacancy in the face of the constitutional provision. The illustration serves to show the difficulties to be encountered when a departure from the provisions of the *Constitution* respecting removals from office is attempted.

Before proceeding to an examination of the cases relied upon by the respondents, certain other considerations advanced by them will be noticed.

■ It is argued that resort to constitutional debates is an unsatisfactory and dangerous means of resolving a question of abstract meaning. That is conceded; but the same authority relied upon by the respondents, 1 *Cooley Const. Lim.* 142, observes that, "when the inquiry is directed to ascertaining the mischief designed to be remedied, or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the convention which framed the instrument. Where the proceedings clearly point out the purpose of the provision, the aid will be valuable and satisfactory." And Mr. Justice Sutherland in *Humphrey's Ex'r v. U. S., supra,* speaking for all of the members of the court, said that while the general rule precluded the use of congressional debates to explain the meaning of words of a statute, they may be considered as reflecting light upon its general purposes and the evils which it sought to remedy. The late Chief Justice did not hesitate to make use of the constitutional debates. *State v. Hart,* 3 *W. W. Harr.* (33 *Del.*) 15, 129 *A.* 691, *infra. Falloon v. Clark,* 61 *Kan.* 121, 58 *P.* 990, 992, affords a striking example of the use of constitutional debates as a means of ascertaining the purpose of a provision of a *Constitution.* See, also, 11 *Am. Jur.* 706 *et seq.,* 12 *C. J.* 711, and cases cited in 1 *Cooley* 142, *supra,* note.

The remarks of the members of the convention during the progress of the debates on *Section* 6 of *Article* 15 were especially directed to the mischiefs to be guarded against and the purpose sought to be accomplished; and, in particular, did it appear that an uncontrollable power of removal from office in the Governor was not wanted.

The respondents rely upon certain expressions in the opinion of the court en banc, in *State v. Burris,* 4 *Penn.* 3, 49 *A.* 930. The relator had been appointed to the office of state detective for a term of four years. Before the expiration of the term, the General Assembly repealed the

act under which the appointment had been made. By a subsequent statute, enacted a few days láter, the office was re-established.

The argument on the part of the relator was that the repealing act was void in that the abolishment of the office deprived him of his salary for the residue of his term, and thereby diminished his salary, contrary to *Section* 4 of *Article* 15 of the *Constitution,* reading, "No law shall extend the term of any public officer or diminish his salary or emoluments after his election or appointment"; and that the repealing act was void in that it was not a bona fide attempt to abolish the office. It was in this connection that the court said that it was not the function of the court to pass upon the motives of the Legislature in the discharge of its duty; that offices created by the Legislature were entirely within legislative control; that unless there was some constitutional limitation, such offices might be modified, abridged or abolished as the Legislature saw fit; and that the only limitation as to the term of office was that, "no law shall extend the term of any public officer," the inherent power of the Legislature to abridge the term or to abolish the office being left untouched. The court did not, even remotely, pass upon the question whether the legislative power with respect to removal from a statutory office, with a fixed term, was constitutionally limited by implication.

The respondents contend that the relator is estopped to invoke the constitutional question for the reason that the incumbents who were removed accepted their appointments and have exercised the functions of the offices under the provisions of the statute. No authority has been cited holding that one, by the acceptance of an office with a fixed term, may not question the constitutionality of a provision of the act creating the office with respect to arbitrary removal of incumbents of the office. From an examination of the cases cited generally by the relator and

the respondents on the question of the power of removal from office, it appears that, in many of them, it was the removed incumbent, as here, who questioned the constitutionality of the provisions of the statute with respect to the power of removal. It is true, of course, that the fact that the principle of estoppel was not invoked in the cited cases furnishes no reason why it cannot be relied on here. The rule, however, rests on substantial grounds of prejudice or change of position. To justify the application of the doctrine of estoppel in the situation shown here, suggests, at least, the necessity for authority more in point than *People v. Murray,* 5 *Hill* (*N. Y.*) 468; *Daniels v. Tearney,* 102 *U. S.* 415, 26 *L. Ed.* 187; and *Ferguson v. Landrum,* 1 *Bush* (64 *Ky.*) 548. In *Hibbard v. State,* 65 *Ohio St.* 574, 64 *N. E.* 109, 58 *L. R. A.* 654, it was held that acceptance of an appointment as a school teacher in the public schools, under the general provisions of a statute, did not estop the appointee from questioning the constitutionality of a provision directing the deduction of a percentage of salary to provide a pension fund. There is no merit in the contention.

The respondents contend, also, that the first sentence of *Section* 6 of *Article* 15, "All public officers shall hold their offices on condition that they behave themselves well," cannot be construed as a limitation on the legislative power. It is asserted that this provision was borrowed from the *Constitution of Pennsylvania,* but as the provision of that *Constitution* confers the power of removal in certain cases, it is manifest that the same provision in our *Constitution* is only a limitation on the right of an officer to hold his office to the end of a fixed term. The provision was not borrowed from the *Constitution of Pennsylvania.* It is as much our heritage as of the people of that state. As has been shown, it appears in the *Charter of Delaware of* 1701 with respect to sheriffs and coroners, in the *Constitution of* 1776, with respect to judges, clerks of the Supreme Court

and recorders, and in the *Constitutions of* 1792 and 1831, with reference to justices of the peace, sheriffs, coroners, Attorneys-General, and all other officers mentioned therein except the Governor. From the history of the provision, or similar provisions, and from the debates in the convention that framed the present *Constitution,* there is every reason to infer that the use of the phrase was, apart from mental or physical disability, as well a guaranty of the right of a public officer to hold his office to the end of the term fixed by law if he behaved himself, as a limitation on that right if he did not behave himself.

The decisions of the federal courts with respect to the power of the President to effect removals from office ought not be regarded as controlling. The *Federal Constitution* is silent with respect to removals from office where the tenure is not fixed as it is in the case of the federal judges. It has already been shown that the power of the President to effect removals from office came into existence as a result of the celebrated "congressional construction" of the *Constitution* in 1789. In *Humphrey's Ex'r v. U. S., supra,* the supposed extent of the presidential power was limited. Expressions suggesting that a Governor of a state may constitutionally be given an arbitrary power of removal as incidental to his duty to enforce the laws may sometimes be found, as in *McCran v. Gaul,* 95 *N. J. L.* 393, 112 *A.* 341, *infra.* See however, the observations of Kalisch, J., dissenting in the same case in the Court of Appeals, 96 *N. J. L.* 165, 112 *A.* 603, at *page* 609. In general, it is to be said that Governors of states do not exercise the arbitrary power accredited to the President. When exercised it is by virtue of specific constitutional provision, or by statute where no limitation of the legislative power exists.

It is contended that the rule expressed by the maxim, *"Expressio unius est exclusio alterius,"* does not apply with the same force to a Constitution as to a statute.

It has been so held where the rule has been sought to be applied to constitutional provisions regulating the taxing power of the Legislature. *Mercantile Incorporating Co. v. Junkin,* 85 *Neb.* 561, 123 *N. W.* 1055, 19 *Ann. Cas.* 269; *Reed v. Bjornson,* 191 *Minn.* 254, 253 *N. W.* 102. The application of the rule has been denied also where the constitutional provision grants no power or authority, but simply prescribes a duty to enact legislation with respect to particular matters. *State v. Bryan,* 50 *Fla.* 293, 39 *So.* 929; *Atkinson Kier Bros., Spicer Co. v. Industrial Commission,* 35 *Ariz.* 48, 274 *P.* 634. It may be conceded that the rule should be applied with caution to provisions of the organic law relating to legislative power.

But as Constitutions must necessarily be general rather than detailed and prolix, many of the essentials with which they treat are impliedly controlled or dealt with by them, and implication plays a very important role in constitutional construction. Accordingly, resort may be had to the well-recognized rule contained in the maxim, and the expression of one thing in a Constitution may necessarily involve the exclusion of other things not expressed. 11 *Am. Jur.* 666, 667; 12 *C. J.* 707; *Page v. Allen, supra.* Judge Cooley expresses the rule in language that is widely quoted: "When the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases." 1 *Cooley, Const. Lim.* 139, and cases cited in extensive note. See *State v. Brunk,* 326 *Mo.* 1181, 34 *S. W.* 2d 94; 46 *C. J.* 985. *Shurtleff v. U. S.,* 189 *U. S.* 311, 23 *S. Ct.* 535, 537, 47 *L. Ed.* 828, it is true, was concerned with a statutory provision which provided that mercantile appraisers might be removed at any time by the President for inefficiency, neglect of duty, or malfeasance in office. Shurtleff was removed without assignment of cause. The

implied power of the President to effect removals from public office was once more upheld, and in speaking of the maxim, *"Expressio Unius est exclusio alterius,"* the court said, "The rule which is expressed in the maxim is a very proper one and founded upon justifiable reasoning in many instances, but should not be accorded controlling weight when to do so would involve the alteration of the universal practice of the government for over a century, and the consequent curtailment of the powers of the Executive in such an unusual manner." It is not contended that the rule is never to be applied to constitutional provisions, and, to paraphrase the language which has been quoted, the rule expressed in the maxim is a very proper one, and should be accorded controlling weight when refusal to do so would alter the universal practice of the government for over a century, and the consequent enlargement of the powers of the Executive in such an unusual manner.

The framers of the *Constitution of* 1897 considered the growing necessity for the creation of additional public officers by the Legislature as the reach of the government widened and became more complex. The several provisions of the former *Constitutions* with respect to removals from office were made applicable to all public officers. In *State v. Churchman,* 3 *Penn.* 167, 49 *A.* 381, the superior court held that the judge of the municipal court for the city of Wilmington, was an "officer" requiring confirmation by the Senate under *Section* 9, of *Article* 3, of the *Constitution.* The Supreme Court, *State v. Churchman,* 3 *Penn.* 361, 51 *A.* 49, 50, held that the section was not comprehensive of municipal officers, and said, "It cannot be doubted, as a general proposition of law applying to the construction of statutory and constitutional provisions alike, that the words 'offices' or 'officers,' taken by themselves, in a statute or constitution, mean state or county 'offices' or 'officers' only." And, there is nothing in the opinion to sug-

gest that the section was not applicable to all state and county officers, whether of constitutional or statutory creation. *State v. Hart,* 3 *W. W. Harr.* (33 *Del.*) 15, 129 *A.* 691, had to do with the same section of the *Constitution* in its relation to the appointment by the Governor to fill a vacancy in a statutory office, and to the election to fill a vacancy in such office. It was not suggested there that the pertinent provisions of the section were not applicable to all public officers. In *State v. Caulk,* 3 *W. W. Harr.* (33 *Del.*) 344, 349, 138 *A.* 354, 357, it was said that *Section* 9, of *Article* 3, and *Section* 5 of *Article* 15, apply to all state and county officers, whether constitutional or statutory. The respondent, in the cited case, urged that the last-mentioned section, reading, "all public officers shall hold their respective offices until their successors shall be duly qualified, except in cases herein otherwise provided," applied only to constitutional offices, but the court said that the language of the section was fully as broad and comprehensive as that of *Section* 9 of *Article* 3, and observed that "no specific argument for limiting the scope of *Section* 5 of *Article* 15 to constitutional offices has been advanced in this case." It would be a strained construction to hold that the unrestricted language of the sections cited are applicable both to constitutional and statutory offices, but that *Section* 6, of *Article* 15, containing language fully as broad and comprehensive, is, with respect to removals from office, confined and limited to offices of constitutional creation. See, also, *State v. Pritchard,* 36 *N. J. L.* 101, at *page* 118; *Houseman v. Com.,* 100 *Pa.* 222; dissenting opinion of Kalisch, J., in *McCran v. Gaul,* 96 *N. J. L.* 165, 112 *A.* 603, at *page* 609 *et seq.* It has not, in fact, been contended that the removal provisions of the *Constitution* do not apply to all public officers, whether their offices are created by the *Constitution* or by statute. Therefore, the same salutary checks and safe-

guards with respect to removals from office apply as well to statutory as to constitutional offices.

Ordinarily, where an office is created by the statute of a state it is wholly within the power of the Legislature creating it, and the legislative power extends to the subject of regulating removals from the office. The *Constitution* of a state may, however, place beyond the reach of hostile legislation the method and grounds for removing incumbents of public offices; and where the *Constitution* prescribes the method of removal and causes for which public officers may be removed, the method and grounds established by this instrument are exclusive, and it is beyond the power of the Legislature to remove them for any other cause or in any other manner. 22 *R. C. L.* 561; 46 *C. J.* 985; 23 *Ency. Law, 2d Ed.,* 431. In *Throop on Public Officers,* § 341, it is said, "it is well settled, that where the *Constitution* creates or recognizes an office, and declares that the incumbent may be removed in a specified manner or for specified reasons, the legislature cannot constitutionally provide by statute for his removal for any other reason or in any other manner."

From what has already been said, the *Constitution* with respect to the reasons and manner of their removal, recognizes alike all public officers; and authorities dealing with removals from offices of constitutional creation are applicable.

The *Constitution of Pennsylvania,* as has been shown, provides that appointed officers, with certain exceptions, may be removed at the pleasure of the appointing power. In *Commonwealth v. Hoyt,* 254 *Pa.* 45, 98 *A.* 782, 784, a statute of Pennsylvania provided for certain causes of removal of inspectors of weights and measures appointed by county commissioners. It was held that the statutory provision was in conflict with the *Constitution.* The court said: "It is entirely settled that when the *Constitution* has de-

clared the grounds or mode of removal the Legislature had no power to authorize removal for any other reason or in any other mode; it cannot provide additional causes, restrict or lessen the causes, or alter the method. On this subject there is no substantial difference in the decisions of the various states."

In *Falloon v. Clark, supra,* the proceeding involved the removal from office of a district judge, a constitutional officer. It was held that such officer could not be removed from office upon other grounds or by other methods than those prescribed by the *Constitution.* The court said, "It must be conceded that, in the absence of constitutional provision or limitation, the legislature would have complete power and discretion to provide by statute for the removal of public officers; but, where the constitution plainly prescribes the grounds and methods of removal, it must be regarded as the paramount law, and not subject to be directly or indirectly changed or nullified by legislative enactment."

*In re Bowman,* 225 *Pa.* 364, 74 *A.* 203, 204, involved the constitutionality of a statute authorizing the courts of common pleas to declare vacant the office of a justice of the peace, a constitutional office, on the failure of the incumbent to reside for six months in his district. *Section* 4 of *Article* 6, of the *Pennsylvania Constitution,* hereinbefore quoted, was considered. The court said, "The condition upon which all officers shall hold their offices, whether conferred by appointment or secured by election, is good behavior. Removal is the penalty for misbehavior. This is the substance and meaning of the first sentence of the fourth section"; and it proceeded to say with respect to the provision that certain officers elected by the people, "shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate."

"A constitutional direction as to how a thing is to be done is exclusive and prohibitory of any other mode which the Legislature may

deem better or more convenient. As the people have spoken directly in adopting their organic law, their representatives in General Assembly met are at all times bound in undertaking to act for them, and what is forbidden, either expressly or by necessary implication, in the *Constitution*, cannot become a law. * * * As a constitutional judicial officer, elected by the people, he is to be removed from his office only by the Governor for reasonable cause after due notice and full hearing, on the address of two-thirds of the Senate, for, though others filling purely legislative offices may be ·without the constitutional provision as to removal, he is clearly within it."

In *Holliday v. Fields,* 210 *Ky.* 179, 275 *S. W.* 642, 647, the respondent was removed from the office of sheriff by executive order pursuant to a statute attempting to include malfeasance and misfeasance as constituting a neglect of official duty. The *Constitution,* as amended, provided for the removal of certain officers for neglect of duty. The court, in setting aside the order, said, "By the constitutional amendment the Legislature is only authorized to provide for the removal of the officers named for neglect of duty, the statute must be read in the light of the power conferred. It appears from the title and the nature of the offenses denounced in the act that the Legislature attempted to include 'malfeasance' and 'misfeasance' as constituting neglect of official duty. To some extent it thus exceeded its power. While the Legislature may designate offenses within the meaning of the constitutional words, it is well settled that it cannot enlarge or extend the terms of that instrument by defining its words or by adding offenses not included therein."

In *Lowe v. Commonwealth,* 3 *Metc.* 237, 60 *Ky.* 237, with respect to the constitutionality of a statute authorizing county courts to suspend jailers, as violative of constitutional provisions relative to impeachment of all civil officers and rendering vacant certain offices whose incumbents had been convicted of enumerated offenses, the court said, "There can be but one view of this question, which is, that whenever the constitution has created an office and fixed its term, and has also declared upon what grounds and in

what mode an incumbent of such office may be removed before the expiration of his term, it is beyond the power of the legislature to remove such officer or suspend him from office for any other reason or in any other mode than the constitution itself has furnished. To recognize the existence of such power would be, in effect, to say that these provisions of the organic law of the land are subject to legislative caprice, and, to that extent, to defeat and violate the restrictions and safeguards which were inserted in the constitution in order to give it permanence and stability. * * * In our opinion the fact that the framers of the constitution inserted in that instrument the several provisions fixing the terms of the offices thereby created, and prescribing the grounds upon which and the modes whereby the incumbents of such offices may be removed, is altogether sufficient to warrant the conclusion that those subjects were fully considered by them, and that they intended, by embodying said provisions in the constitution, to make them permanent and fixed, and thus to place the subjects to which they relate altogether beyond legislative control." The opinion is quoted with approval in *State v. Brunk, supra.*

*Page v. Hardin,* 8 *B. Mon.* (47 *Ky.*) 648, is worthy of careful consideration. Hardin had been appointed secretary of state under a constitutional provision fixing the term, "during the term for which the governor shall have been elected, if he shall so long behave himself well." *Const. Ky.* 1799, *Art.* 3, § 24. The Governor removed him for failure to reside at the seat of government and neglect of duty. The *Constitution* provided for the impeachment of all civil officers; for the removal of judges and justices of the peace for any reasonable cause not being sufficient ground of impeachment, upon address to the Governor by two-thirds of each house of the General Assembly; and for removals of clerks of court by the Court of Appeals for breach of good behavior. The pertinent parts of the opinion are too long to

be quoted in full. It is valuable for its philosophic discussion of the meaning and pregnancy of a tenure during good behavior, the court saying: "A consideration of the utmost gravity weighing powerfully against the inference of any resulting power in the Governor, to remove upon his own judgment of the officer's misbehavior, and indeed against the existence of the power of removing any constitutional officer, * * * except in the modes prescribed by the constitution itself, is that the obvious and only reason for placing all officers upon that tenure, is that every officer might be secure in the independent discharge of the duties of his office, secure in the certainty that he could not be displaced except for breach of good behavior, or in case of the Judges and Justices [of the Peace], for some cause clearly expressed and deemed sufficient by the prescribed tribunal; and secure in the confidence that he could only be removed upon conviction, implying proof, trial and judgment, and in a proceeding regulated by law or guarded by its publicity and by established forms and usages. These guaranties of official independence and security, the constitution provides by the modes and tribunals which it establishes for the removal of officers, and especially by the requisition that two-thirds of the members of the appointed tribunal shall concur in the sentence of removal." The opinion concludes, "The Governor may fill an existing vacancy, but cannot, in our opinion, in any manner create one in an office held on the tenure of good behavior; nor conclude the officer by his judgment or decision as to the existence of a vacancy."

In *Dullam v. Willson*, 53 *Mich.* 392, 19 *N. W.* 112, 51 *Am. Rep.* 128, the respondent had been appointed one of the trustees of a state institution for a term of six years. During the term he was removed by the Governor, without notice or hearing, for alleged official misconduct and neglect of duty. The removal was made under the provisions of a statute enacted prior to the *Constitution of* 1850, and by it

the Governor was empowered during the recess of the Legislature to remove from office certain enumerated officers and all state and county officers, except the state treasurer and the judges, for official misconduct, or habitual or willful neglect of duty. The *Constitution* in force, at the time of the enactment, provided for the impeachment of all civil officers; for the removal of judges for any reasonable cause, not a sufficient ground for impeachment, upon the address of two-thirds of each branch of the Legislature; and directed the Legislature to provide by law for the removal of justices of the peace, and other county and township officers, in such manner and for such causes as should seem just and proper. After the enactment of the statute under which the removal was made, the *Constitution* was amended, giving the Governor power, in the recess of the Legislature, to examine unto the condition and administration of any public office, and to remove from office any public officer, elective or appointed, except legislative and judicial officers, for gross neglect of duty or for corrupt conduct in office, or any other misfeasance or malfeasance therein.

It was held, first, that the statute furnished no valid basis for the power of removal, because it was repugnant to the *Constitution of* 1835, which vested no judicial power in the Governor, and was not validated by the *Constitution of* 1850 as amended; second, that the Governor's power of removal could only be exercised for the specific causes mentioned in the *Constitution,* and upon charges which should specify the particular acts or neglects relied on; and that the Governor was not authorized to exercise the power at his pleasure or caprice.

In *People v. Howland,* 155 *N. Y.* 270, 49 *N. E.* 775, 777, 41 *L. R. A.* 838, it was said of the constitutional office of justice of the peace, "Not only is the office itself placed beyond the reach of hostile legislation, but also the term

thereof, the method of filling it, and, by implication, the method of removing an incumbent."

*Lizano v. City of Pass Christian,* 96 *Miss.* 640, 50 *So.* 981, 982, holds that constitutional restraints on legislative power with respect to removals from office apply to offices of statutory origin. The *Constitution* provided that all public officers, for willful neglect of duty, or misdemeanor in office, shall be liable to presentment or indictment by a grand jury, and upon conviction, shall be removed from office, and otherwise punished as may be prescribed by law. The appellant, a city marshall, was removed from office by the municipal authorities purporting to act under a city ordinance authorized by the Code, without indictment or conviction. The court, in reversing the judgment of the circuit court, first held that the city marshal was a public officer within the meaning of the constitutional provision; and in answer to the contention advanced that since the city marshal was not a constitutional officer, certain authorities cited had no application, the court said, "We do not think there is anything in this contention. *Section* 175 applies to 'all public officers,' and the city marshal is certainly a 'public officer,' within the meaning of the *Constitution.*"

In *Ware v. Poole,* 111 *Miss.* 599, 71 *So.* 868, 870, the court decided the question presented as one of statutory construction, and said that it was not necessary to harmonize the statutory method of removal with *Section* 175 of the *State Constitution.* It said, however, of the statute which purported to authorize the State Board of Health to remove a county health officer, an office with a term of two years, at any meeting and fill the vacancy thereby occasioned, "certain it is that the Legislature never intended that one of our public officers should be thrust out of office without any reason whatever. The humblest employe in the private walks of life, with a definite contract of employment for a stated period of time, could not thus summarily be

discharged from service without good cause. * * * If this is not the meaning of that section giving the board the right to remove, then the other provision of the statute fixing the term of office at two years would mean nothing."

In *Williams v. State,* 197 *Ala.* 40, 72 *So.* 330, *Ann. Cas.* 1918D, 869, a statute, creating a commission form of government for the city of Mobile, established the office of commissioner with a term of three years. By another section provision was made for the recall of any commissioner during the term of office by an election to be held for such purpose. *Section* 175 of the *Constitution* provided for the causes and methods of removal of all officers of incorporated cities and towns. It was held, following *Nolen v. State,* 118 *Ala.* 154, 24 *So.* 251, that the inhibitions of the *Constitution* must be read into all statutes, and when so read into the statute in question, they rendered inoperative the recall provisions. See, also, *Owens v. Troy,* 229 *Ala.* 439, 157 *So.* 865.

Other authorities in general support of the rule that the legislative power over removals from office may be restrained impliedly by constitutional provisions, are *State v. Kohler,* 200 *Wis.* 518, 228 *N. W.* 895, at *page* 907, 69 *A. L. R.* 348; *Reid v. Smoulter,* 128 *Pa.* 324, 18 *A.* 445; 5 *L. R. A.* 517; *State v. Superior Court of Pierce County,* 92 *Wash.* 375, 159 *P.* 84; *Laverty v. Cochran,* 132 *Neb.* 118, 271 *N. W.* 354; *Com. v. Williams,* 79 *Ky.* 42, 42 *Am. Rep.* 204; *In re Georges Township School Directors,* 286 *Pa.* 129, 133 *A.* 233; *State v. Gravolet,* 168 *La.* 648, 123 *So.* 111; *State v. Dunson,* 138 *La.* 131, 70 *So.* 61; *Conroy et al. v. Hallowell,* 94 *Neb.* 794, 144 *N. W.* 895. In 99 *A. L. R.* 336, is an extensive note in which the cases involving the power to remove a public officer are collected.

The authorities relied upon by the respondents will be examined.

In *Johnson v. Laffoon,* 257 *Ky.* 156, 77 *S. W.* 2d 345, the appellant had been appointed to the statutory office of road commissioner for a term of four years, and had been confirmed by the Senate. Before the expiration of his term of office he was removed by the Governor pursuant to the provisions of a statute which empowered the Governor to remove from office any person appointed to an office by the Governor for any cause the Governor might deem sufficient, and requiring only, to cause a vacancy in the office, that the order of removal be entered in the executive journal. The argument was that the incumbent of the office with a fixed term had a property, or *quasi* property right therein, and that his arbitrary removal was in violation of the second section of the *Bill of Rights* as contained in the *State Constitution,* reading, "Absolute and arbitrary power over the lives, liberty and property of freeman exists nowhere in a republic, not even in the largest majority." No other constitutional provision was cited or relied upon. The court said that the act was not unconstitutional as depriving the appellant of property or *quasi* property in his office, and that the Governor could remove an appointive statutory officer with or without cause or trial. From such examination of the *Constitution of Kentucky* as has been possible, it seems that, apart from the usual provisions with respect to impeachment, there were no provisions at all for the removal of public officers except certain named officers, judges of the county court, justices of the peace, sheriffs, coroners, surveyors, jailers, assessors, county attorneys and constables. With respect to these officers conviction of misfeasance, malfeasance in office, or willful neglect in the discharge of official duties caused a vacancy. Provision was made for the removal of judges of the Court of Appeals and of the circuit courts by the Governor for any reasonable cause upon the address of two-thirds of each house of the General Assembly. There was no such provision with re-

spect to "any officer" as in *Section* 13 of *Article* 3 of the *Constitution of Delaware,* nor any provision analogous to *Section* 6 of *Article* 15 with respect to a tenure during good behavior, or providing for the removal of "any public officer convicted of misbehavior in office or of any infamous crime." In the absence of definite provisions with respect to removals from office applicable to all public officers, there is ground for the conclusion reached by the Kentucky court.

In *People v. Dreher,* 302 *Ill.* 50, 134 *N. E.* 22, 24, the mayor of a city was removed from office by the city council for alleged misconduct. The statute regulating removals of municipal officers was not complied with, and the action of the city council was set aside. The court distinctly said that there was "no prohibition or limitation in the *Constitution* of this state on the power of the Legislature to prescribe the means by which officers, other than judicial officers, below the grade of state officers, may be removed from office. That power, therefore, rests entirely in the hands of the Legislature." There being no limitation on the power of removal with respect to the office, the power necessarily reposed in the Legislature.

*Sweeney v. Stevens,* 46 *N. J. L.* 344, involved the right of the freeholders of a county to remove a jailer. The language of the court, general in its nature, with respect to the power of the Legislature, in creating an office, to provide for the manner of its vacation, should be considered in the light of the *Constitution* of the state which, apart from the usual provision for impeachment of officers, makes no provision whatever for the removal of officers not even upon the address of the Legislature.

The same comment may be made with respect to *McCran v. Gaul,* 95 *N. J. L.* 393, 112 *A.* 341. There the respondent was removed from office as a member of the Board of Public Utility Commissioners, for misconduct in office and neglect of duty, pursuant to authority conferred upon

the Governor by the statute creating the board. The stress of the contention was that the statute attempted to confer judicial power upon the Governor in contravention of *Article* 3 of the *Constitution* providing for the distribution of the powers of government. It was also contended that the power of removal in question was unconstitutional in that it attempted to confer upon the Governor jurisdiction which the *Constitution* vested exclusively in the court for the trial of impeachments. The court denied both contentions, and with respect to the latter, pointed out that the impeachment provision related solely to misdemeanor in office involving as an essential element an improper motive or purpose; that the proceeding was highly penal and one to which the pardoning power did not extend after conviction.

The court was careful to say at the outset that the policy of conferring upon the governor the power of removal for cause of statutory officers appointed for a fixed term was not a new one, and had been exercised many years before the passage of the statute before the court, and frequently since.

*Trainor v. Board of Auditors,* 89 *Mich.* 162, 50 *N. W.* 809, 15 *L. R. A.* 95, involved the removal by the Board of Auditors of a county, of a city physician, a special officer in justice courts, a chief janitor of county buildings and a file clerk of county records. The court distinctly said that the positions did not "attain to the dignity of an office." "They are not officers, but employees. * * * *Quo warranto* would not lie for any of them." An examination of the *Constitution* of the state would seem to indicate that there was no limitation on the legislative power with respect to removal from office except in the case of judges.

*Sims v. Moeur,* 41 *Ariz.* 486, 19 *P.* 2d 679, 681, is not opposed. There, the Governor preferred charges against members of the Industrial Commission and, after hearing,

removed them under the authority of the act creating the commission. The court, in speaking of the removal provision of the act, said, "This provision does not in any way conflict with the *State Constitution.* That instrument is silent as to the power of removal from office, and in such case it is left with the Legislature to regulate it by statute." The implication is that constitutional provisions with respect to removals from office would be regarded as exclusive.

*Taft v. Adams,* 3 *Gray* (69 *Mass.*) 126, involved a statute which shortened the term of a county commissioner. Chief Justice Shaw, after stating that where an office is created by law, and one not contemplated, nor its tenure declared by the *Constitution,* but created by law solely for the public benefit, it may be regulated, limited, enlarged or terminated by law, as the public exigency or policy may require, proceeded to say of the office in question, "Their mode of appointment or election has been fixed, their tenure of office established, their powers restrained or enlarged, by the operation of successive laws, and at each of these changes many of those who were previously in office, for certain or uncertain terms, were necessarily divested of those offices. These changes by force of law have been acquiesced in. And we are of opinion that the act in question, changing the time and mode of choosing county commissioners, and which seems to have been waranted by a long course of precedents, in regard to a class of officers nearly analogous, was not beyond the constitutional authority of the legislature." The question was not one of removal from office by the appointing power; but in this connection it is to be said that the *Constitution of Massachusetts,* apart from impeachment provisions, is silent as to removals from office except in the case of judicial officers and notaries public who may be removed by the Governor, with the consent of the council, upon the address of both houses of the Legislature.

■ *People v. Whitlock*, 92 *N. Y.* 191, has no particular significance. It was cited, as it may be supposed, because of the expression in the opinion, "The office was created by the legislature, and they might abridge its term by express words, or specify an event, upon the happening of which it should end." The real point decided was that, under the statute, a local act, no cause for removal of a police commissioner of the city of Syracuse need be alleged. The general language of the opinion ought not to be pressed beyond the necessities of the case. Furthermore, it would seem that, under the *Constitution* then in force, there was no general provision with respect to removals from office. Apart from the impeachment provision which is silent as to the officers subject to impeachment, there were separate provisions with respect to the removals of certain enumerated officers, and a general direction to the Legislature to provide by law for the removal for misconduct or malversation in office of all officers elected at general elections (except judicial) whose powers and duties were not local or legislative.

In *State v. Kipp*, 10 *S. D.* 495, 74 *N. W.* 440, 442, the office involved was the statutory office of commissioner of insurance, made appointive by the Governor for the term of two years, "unless sooner removed by him." The respondent was removed apparently without cause. *Section* 3 of *Article* 16 of the *Constitution* provided for the impeachment for enumerated causes of the Governor and other state and judicial officers with certain exceptions. *Section* 4 provided, "All officers not liable to impeachment shall be subject to removal for misconduct or malfeasance or crime or misdemeanor in office or for drunkenness or gross incompetency, in such manner as may be provided by law." The respondent contended, first, that he was a state officer, and could only be removed by impeachment, second, if not a state officer, he was included within the term, "all officers"

contained in *Section* 4 of the *Article.* The court denied both contentions. The term, "all officers," was construed to mean only county officers and such officers as were not, strictly speaking, state officers, but yet were designated in the *Constitution.* "Thus," said the court, *"We have a class of state officers only removable by impeachment; a class of state officers and county officers only removable for cause, but in such manner as may be provided by law; and a large class of township, municipal, district officers, and officers created by the legislature whose tenure of office and manner of removal are entirely within the control of the legislative power. The office of the commissioner of insurance comes clearly within the latter class."* As the *Constitution* of the state was construed, the decision was in accord with the general rule that the legislative power with respect to removals from office is supreme except where restrained and limited by the *Constitution,* and it is not opposed to the conclusion which has been reached here, for limitation by implication on the legislative power with respect to removal from office is distinctly recognized.

In the immediate connection, *State v. Mitchell,* 50 *Kan.* 289, 33 *P.* 104, 20 *L. R. A.* 306, has no bearing. It will be considered later in the discussion of the question of statutory construction. The *Constitution* of the state provided, "The tenure of any office not herein provided for may be declared by law; when not so declared, such office shall be held during the pleasure of the authority making the appointment." *Article* 15, § 2. Apart from impeachment proceedings, the *Constitution* appears to contain no provision for the removal of public officers.

Also, in the immediate connection, there is no pertinency in the case of *State v. Burke,* 8 *Wash.* 412, 36 *P.* 281. It is distinctly stated in the opinion of the court that the appellant did not attack the statute on constitutional grounds, and that the court did not consider the constitutional ques-

tion under the well-settled rule that courts will approach constitutional questions with the greatest caution, and will not consider such questions unless they are directly involved. The case will be considered later.

The cases most strongly relied on by the respondents are *Townsend v. Kurtz*, 83 *Md.* 331, 34 *A.* 1123, 1124, and two North Dakota cases, *State v. Archibald*, 5 *N. D.* 359, 66 *N. W.* 234, and *State v. Prater*, 48 *N. D.* 1240, 189 *N. W.* 334.

In the Maryland case, the office involved was the chief officer of the insurance department, known as insurance commissioner. The statute provided for the appointment of such officer by the Governor, treasurer and comptroller for a term of four years unless sooner removed by the officers making the appointment. The relator was removed during his term of office for no cause shown, and without notice or hearing. As stated by the court, the real question was whether the statute was to be construed as to limit the power of removal to one for cause. In the course of its opinion the court said, "but it is also true that the legislature has the undoubted right to authorize the appointing power to remove its appointees without assigning any cause, when they are appointed under statutory laws." This expression is seized upon to support the position of the respondents, but what was said must be considered in the light of the *Constitution* of the state. By *Section* 13 of *Article* 2 it was provided that all civil officers appointed by the Governor and Senate "shall be nominated to the Senate; * * * and their term of office, except in cases otherwise provided for in this *Constitution,* shall commence * * * and continue for two years, (unless removed from office)." By *Section* 15, the Governor was empowered to "remove for incompetency or misconduct, all civil officers who received appointment from the Executive for a term of years." By *Section* 22, it was provided that a secretary of state be ap-

pointed by the Governor "who shall continue in office, unless sooner removed by the Governor, till the end of the official term of the Governor from whom he received his appointment." The usual power of impeachment "in all cases" was lodged, in the House of Delegates, but the causes of impeachment were not enumerated.

Separate and distinct provisions were made for the compulsory retirement of judges for certain reasons; and for their removal, on conviction of certain offenses and crimes, or on impeachment, or on the address of the Legislature, upon notice and hearing. Separate provision was made for the removal of the clerk of the court of appeals, clerks of the circuit courts, registers of wills, justices of the peace and constables, the Attorney-General, state's attorneys, comptroller, treasurer and mayor of the city of Baltimore. There was no general removal provision applicable to all public officers and, it will be noted that the office in question was of special statutory creation, not appointed by the Governor with the consent of the Senate, but by the Governor, treasurer and comptroller. The court proceeded to say that as the statute made no express declaration with respect to the cause of removal, the question would be approached from the standpoint of the language used, of the provisions of the *Constitution* and other statutes with reference to the removal of officers, and of the history of the law establishing the office. It appeared that, originally, the comptroller was directed to assign a clerk in charge of the insurance department, who should hold his office during the term of the comptroller making the appointment unless sooner removed by the comptroller, and, as the court said, the officer was a mere subordinate. The court then proceeds to say that there was little doubt that the comptroller could have removed the clerk at any time, and asks why the Governor, comptroller and treasurer in whom the power of removal was vested in identical lan-

guage, could not have the same privilege. It seems to be clear that an incumbent of the office in question did not come within the protection of any constitutional provision, and the question really decided was whether a removal could be made without cause.

*State v. Archibald,* 5 *N. D.* 359, 66 *N. W.* 234, 242, involved the removal of the superintendent of the State Hospital for the Insane. The board of trustees was authorized to appoint a superintendent and to remove him at pleasure. No term of office was fixed by the statute. The respondent was appointed to the office for the term of one year, but was removed before the expiration of the term. A by-law adopted by a former board provided for removal upon charges in writing and upon notice. The court said that the by-laws were to be construed in the light of the power of removal vested in the board, which was an absolute power and one not to be prejudiced by any limitation imposed thereon by a by-law. It was urged that the office came within the protection of *Section* 197 of the *Constitution,* providing that, "All officers not liable to impeachment shall be subject to removal for misconduct, malfeasance, crime or misdemeanor in office, or for habitual drunkenness or gross incompetency in such manner as may be provided by law." The court conceded the office to be one within the constitutional provisions, but said that as the *Constitution* did not declare that the officers therein referred to could not be removed in any other way, they could be removed for other causes, or without cause, if the Legislature so declared, provided the offices were statutory offices. The question decided was that where no term of office is fixed, the power of arbitrary removal is vested in the appointing power as an incident to the power of appointment; for, it was said, *"Section* 197 of the constitution has not taken away or impaired the power of the legislature to provide that any officer whose office is created by the legislature

shall hold his office not for any fixed term, but during the pleasure of the board or officer appointing him." But from the expressions of the court, and from a consideration of *State v. Prater, supra,* it appears to be the conclusion in North Dakota that restraint upon the legislative power of removal from offices of statutory creation can never arise by implication, but only by express limitation, under the *Constitution* of that state. In the latter case, the term of office was for two years. The Chief Justice, specially concurring, was of the opinion that the officer was not a public officer at all, but merely a special agent or employee appointed for two years, "subject to removal by the Board." With the greatest deference to the North Dakota court, a disagreement with its view may be permitted. And this also may be said, the court there was not confronted with a public policy of over a century, nor with constitutional debates showing clearly the purpose of the provision.

The relator, to some extent, relies on *Humphrey's Ex'r v. U. S., supra.* That case is not a direct authority for his position. The point there decided was this, that notwithstanding the "congressional construction" given to the *Federal Constitution* in 1789 relative to the power of the President to effect removals from office, and the decisions of the Supreme Court containing expressions that would seem to withhold from Congress all power to control the President in the exercise of his arbitrary power of removal, yet there were offices, not purely executive in their nature, but clothed with *quasi* judicial functions, over which the power of Congress to control arbitrary removals therefrom might be exercised; and that the office of federal trade commissioner was such an office.

The underlying philosophy of the decision is in support of the relator's position. It was there said that "the fundamental necessity of maintaining each of the three general departments of government entirely free from the control

or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. * * * The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there." The writer of the opinion then quotes James Wilson, one of the framers of the *Constitution* and a former justice of the Supreme Court, and certainly well known to the people of this state, who said that the independence of each department required that its proceedings "should be free from the remotest influence, direct or indirect, of either of the other two powers."

The Industrial Accident Board is a court created to hear and determine a class of cases over which it is given jurisdiction. Its functions are of a judicial character. *Bethlehem Shipbuilding Corp. v. Mullen,* 2 *W. W. Harr.* (32 *Del.*) 55, 119 *A.* 314. The members of the board ought not to be subjected to the remostest influence of the Executive. If the contention of the respondents is to be accepted, there is no reason why the judge of the municipal court of the city of Wilmington, the judges of the courts of common pleas of New Castle and Kent counties, and the judges of courts and members of judicial agencies which may be established by the Legislature may not be made subject to removal without cause by the appointing power. If such is the meaning of the *Constitution,* while the lowliest justice of the peace in the most remote village is protected in the right to hold his office except as he may give cause for his removal, yet the members of the Industrial Accident Board, who exercise a jurisdiction of the greatest importance may be removed from the judicial, or *quasi* judicial offices, without cause. Such result was not within the contemplation of the framers of our *Constitution.*

The question of statutory construction is next to be considered.

■■■■■ The respondents contend that it is necessary, under the rules of construction, to construe the statute as creating an indeterminate term of office, not exceeding six years, to be determined at the pleasure of the Governor. In support of their contention they rely on certain well known rules of construction; that a statute must be so construed, if fairly possible, as to avoid the conclusion that it is unconstitutional, *State v. Fountain,* 6 *Penn.* 520, 69 *A.* 926; that all words of a statute must, if possible, be given effect, *Harlee v. Federal Finance Corporation,* 4 *W. W. Harr.* (34 *Del.*) 345, 152 *A.* 596; and that effect, if possible must be given to every word and phrase of the statute so as to render it a harmonious whole, *Harlee v. Federal Finance Corporation, supra.* These rules of construction will, of course, be accepted, but in connection with another rule, which is, that where the language of a statute is plain and unambiguous and its meaning clear and unmistakable, there is no room for construction. *Van Winkle v. State,* 4 *Boyce* (27 *Del.*) 578, 91 *A.* 385, *Ann. Cas.* 1916D, 104; *State v. Foote,* 5 *W. W. Harr.* (35 *Del.*) 514, 168 *A.* 245; *State v. Bethlehem Steel Corporation,* 7 *W. W. Harr.* (37 *Del.*) 441, 184 *A.* 873.

■■■ The language of the act is clear, precise and without ambiguity. The first appointments to the offices were to be made for two, four and six years, respectively, and thereafter, definitely, for six years. The purpose of the staggered appointments was, as is evident, to guard against a board of inexperienced persons. See *Wentz v. Thomas,* 159 *Okl.* 124, 15 *P.* 2d 65; *Humphrey's Ex'r v. U. S., supra.* To construe the term of office as one at the pleasure of the Executive would be to ignore the very rules of construction which the respondents themselves invoke. The language of the act with respect to term of office cannot be ignored. It must be given effect if possible, and it is possible. Indeed, there is no difficulty whatever. An office with a fixed term is created,

and an arbitrary power of removal is conferred. The language is so clear that he who runs may read. It is idle to say that the effect of the language is to create an office at the pleasure of the Governor. Result should not be confounded with express language. For example, an estate may be held by way of limitation or on condition. A limitation marks the point beyond which the existence of the estate is not contemplated. A condition is a happening or event which destroys the estate. When the limitation takes effect, or the event constituting the condition happens, the result is the same; the holder of the estate ceases to enjoy it; but the nature of the estate is not changed.

*Townsend v. Kurtz, supra,* strongly relied on by the respondents in support of the constitutional question presented, refutes their argument upon the question of statutory construction. There it was contended, as here, that the tenure of the office was not for a fixed term, but that it was of uncertain and indefinite duration, the incumbent being removable at the will of the appointing power. "But," said the court, "it would seem that under the very terms of the statute the tenure of this office is not for such an indefinite term as that. The statute says he shall be appointed 'for the term of four years,' and that he 'shall hold his office during the term for which he is appointed, or until his successor is appointed and qualified, unless sooner removed by the governor, treasurer, and comptroller.' We will have to discuss later on the effect of this power of removal, but it cannot properly be said that the appointment is not originally for a definite term, although subject to removal by the action of all of the officers above named. It is true, he may not hold the office four years by reason of death, resignation, or his removal, if done in the way authorized by law, but that is the time designated by the statute for which he shall hold it, subject to those contingencies. *It is therefore distinguished from that class of cases in which*

*the appointing power is authorized to appoint officers without naming some fixed term.* Most, if not all, officers provided for by the constitution may be removed under the express authority given by that instrument; but the fact that they may be removed does not convert their offices from those for definite terms into those held at the will of the persons making the appointment. The constitution, for example, in *Section* 13 of *Article* 2, says that the term of all civil officers appointed by the governor and senate, except in cases otherwise provided for, shall 'continue for two years (unless removed from office) until their successors respectively qualify according to law'; and *Section* 15 of the same article authorizes the governor to 'remove for incompetency or misconduct all civil officers who received the appointment from the executive for a term of years.' It has never been suggested, so far as we are aware, that such offices were not for the fixed term of at least two years, notwithstanding the fact the incumbents might be removed within that time."

In *Williams v. State, supra,* on rehearing, 197 *Ala.* 40, 72 *So.* 330 at *page* 338, *Ann. Cas.* 1918*D,* 869, the Chief Justice said, "The minority seem to proceed upon the theory that the recall feature of *Acts* 1911, *p.* 345, § 14, operates upon the term and cuts down a fixed term of three years, as fixed by *Sections* 4 and 10, to an indefinite or unfixed term, but not to exceed three years. If this construction could be given the act, we are willing to concede the soundness of the conclusion of the minority. The majority, however, think that the recall, as provided by *Section* 14 of the act, relates only to the incumbent and not the term, and that the statute is so plain in this respect that there is nothing to interpret."

The respondents rely on *State v. Burke, supra,* and *State v. Mitchell, supra.*

In the *Burke Case,* the respondent had been appointed a member of the State Capitol Commission, created by statute. *Laws Wash.* 1893, *p.* 462. The members of the commission were to be appointed by the Governor and confirmed by the Senate, and were to hold office until the state capitol was completed, "unless sooner removed for cause, by the governor." *Section* 1. By another act it had been provided that whenever the Governor should be satisfied that any officer not liable to impeachment had been guilty of misconduct or malfeasance in office, or was incompetent, he might order his removal, and in that event, he should file with the secretary of state a statement showing his reason with the order of removal, and, at the time of making the removal, the Governor should appoint some proper person to fill the office. The respondent was removed from office without notice or hearing, but the statute was complied with, for the order of removal specified that it was for misconduct in office. The respondent contended that he was entitled to notice and hearing, as the removal could only be for cause. The court held that the statute, under which the respondent had been appointed, and the removal statute should be construed together; and that construing them together, while the removal must be for cause, there was nothing in the removal statute requiring a hearing, for the reason that it provided that, at the time of making the removal, the Governor should fill the vacancy. This provision was held to be inconsistent with the view that the act of removal was not intended to be final. It was in this setting that the court said that by inserting the removal clause in the statute, in view of the general removal statute, the intention was not to fix a definite term, and that the appointees should hold their offices so long as they should perform their duties to the satisfaction of the Governor. The court further observed that the removal statute seemed to have been passed in pursuance of *Section* 3, *Article* 5, of

the *Constitution,* providing that "all officers not liable to impeachment shall be subject to removal for misconduct or malfeasance in office, in such manner as may be provided by law," and said that the office was not within the class of state officers liable to impeachment. The point of the case was that the Governor had power, under the statutes, there being no constitutional limitation, to remove a statutory officer for cause, but that notice and hearing before removal was not required. It has already been pointed out, in prior comment on this case, that the statute was not attacked on constitutional grounds, and it would seem that much of what was said with respect to the power of the Legislature to create offices with terms, but at the will of the Governor, and that the statute should be construed in that way, was beside the point; for, whether the office was for a certain or uncertain term, the Legislature, under the *Constitution,* had the power to provide for removals from office for cause, and did, by the removal statute, make such provision. As has been said, the point of the case was that, reading the two statutes together, the Governor was not bound to give the respondent a hearing before ordering his removal.

In the *Mitchell Case,* the respondent had been elected by the executive council to the office of railroad commissioner for a term of three years. The statute provided for the election of three commissioners, the terms of the first appointees to be for one, two and three years respectively, and thereafter for three years, but subject to removal at any time by the council. Before the expiration of his term, the respondent was removed. He contended that his term of office had been declared by the statute to be for three years; that his term had not expired; and that under the *Constitution* of the state he had not been legally removed. The *Constitution* provided that the tenure of any office not therein provided for might be declared by law, and when not so declared, such office should be held during the

pleasure of the authority making the apppointment. In these circumstances, the court held that it should give reasonable effect to the whole of the. statute; and that it could not, therefore, refuse to give effect to the language of the removal clause, nor could it ignore the provision for a three-year term. It construed the statute as providing for a term of three years unless sooner removed by the executive council. From an examination of the *Constitution* of the state, it would appear that there was no provision for the removal of statutory officers. By. express provision of the *Constitution*, the tenure of any office, not declared by law, was at the pleasure of the authority making the appointment. The court, therefore, was not embarrassed by any constitutional limitation on the legislative power with respect to removals; and it construed the statute in the only way it could be construed under well-understood rules of construction.

The authorities cited by the respondents give little support to their view of the proper construction of the statute. Its language is so plain and understandable that the average intelligent mind can grasp its meaning. The respondents' dilemma is this: All of the language of the statute must be given meaning and effect, if it is possible to do so; and under this rule, the statute is not to be construed as creating the offices in question with an indefinite term, that is, at the pleasure of the Governor. It is to be construed, as it plainly reads, as creating offices with fixed terms of six years, but with an arbitrary power of removal vested in the Governor. The Legislature may create an office. It may fix the. term of the office. But, having created an office with a fixed term, the *Constitution*, by necessary implication, forbids the Legislature to confer upon the Governor the power arbitrarily to remove therefrom an incumbent of the office who has been duly appointed, commissioned and confirmed.

The question presented is of supreme importance to the people of this state. The *Constitution* expresses the will of the people whose instrument it is. It is not for the courts, but for those who made it, to supply its defects, if defects there be. The expressions of Chief Justice Bronson, in *Oakley v. Aspinwall,* 3 *N. Y.* 547, have been considered of sufficient importance to be incorporated in the note to 1 *Cooley, Const. Lim.* 152, a part of which will be quoted as being entirely opposite to the situation here disclosed. Said the learned Chief Justice, "There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. * * * If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await the process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of the government, opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."

The removal clause contained in the second paragraph of the section of the statute, *Section* 116, *c.* 233, *vol.* 29, *Del. Laws,* as amended, *Section* 6093, *Rev. Code* 1935, must fall. The members of the Industrial Accident Board, whose removal from their offices has been attempted by executive order, are entitled to hold their offices until the expiration of the terms for which they have been appointed,

unless removed for constitutional causes and by constitutional methods.

Judgment of ouster must, therefore, be entered against each of the respondents; and it is so ordered.

SPEAKMAN, J., concurs.

RODNEY, J., dissents.

RODNEY, J. (dissenting) :

I find myself unable to agree with the majority of the court and shall, but briefly, give my reasons. Dissenting opinions do not express the law of the case then under consideration and, therefore, have but little weight. I do not flatter myself that my views, where they differ from the opinion of the court, have particular value, but a proper regard for the importance of the question requires that I briefly give the reasons for my dissent.

On April 2, 1917, the *Delaware Workmen's Compensation Law* was approved and became effective. 29 *Del. Laws, c.* 233. It provided that the Governor should appoint three members to constitute the board. These members were originally appointed for terms of two, four and six years respectively, and the act further provided that as the terms of office expire by death, resignation, removal from the state or otherwise, that appointments should be made for terms of six years each. The act then provided "Each person appointed under the provisions of this section shall hold office until his successor is appointed and qualified. The Governor may remove any member of said Board with or without cause." *Section* 116, as amended, *Rev. Code* 1935, § 6093.

It is in this last sentence "The Governor may remove any member of said Board with or without cause" that all the difficulties of the case are to be found.

The relator contends that the term is a fixed term of six years and that, under the *Constitution*, this term may not be abridged except in the manner provided by the *Constitution*.

The defendants contend that there is no fixed term but since the Governor can under the act remove with or without cause that the term is at the will of the Governor, with a maximum of six years in case the Governor has not exercised his right of removal.

In determining between the views of the parties there are two primary and commanding rules of statutory construction that must be considered.

(1) Where an act is fairly susceptible of two constructions, one of which will uphold the validity of the act while the other will render it unconstitutional the one which will sustain the constitutionality of the law must be adopted.

(2) It is a cardinal rule that significance and effect shall, if possible, be accorded to every section, clause, word or part of the act.

No citation of authorities in support of the foregoing rules can possibly be needed, but it is merely necessary to apply the rules.

The relator contends that the fixed term of six years must prevail, but if that be true then the provision that "the Governor may remove with or without cause" must be entirely stricken from the act or from any consideration. This I think violates both rules of construction as above set out.

The defendants contend that the removal by the Governor is an express evidence of the legislative intent and that the term of six years was an expression of a maximum term in case the will of the Governor as to removal was not exercised. The adoption of this construction gives full force and effect to both rules of construction. All words are given

effect and the constitutionality as to this point is maintained.

The relator contends, however, that the Legislature is without power to give to the Governor the right to remove "with or without cause," and this question must now be briefly considered.

In the system of government such as we enjoy in Delaware all rights inhere in the people. Under the *Federal Constitution* the national government possesses only the powers and can exercise only the rights which are expressly or implicitly given in the *Constitution*. All rights not given by the *Federal Constitution* are reserved to the states. This principle is only partially true in our state government.

Our state government consists of three co-ordinate branches, the executive, the judicial and the legislative. The executive and judicial branches draw their power from the *Constitution* and as to them the *Constitution,* like the *Federal Constitution,* is a grant of power. The legislative branch of the state government, however, represents the sovereign power of the people and as to it the *Constitution* is not a grant of power but merely a limitation.

The legislative branch is the organized body of the people in general, and has all the powers inherent in the people except in so far as it is limited by the *Constitution:* it represents the great residuum of power which is only limited by the express terms of the *Constitution* by plain implication.

The right of the Legislature to create the Workmen's Compensation Board is, of course, admitted. In *State ex rel. McVey v. Burris, 4 Penn.* 3, 49 *A.* 930, 931, it is said: "It is well settled that offices created by the legislature are entirely within legislative control. * * * Unless there be some constitutional limitation, such offices may be modified, abridged, or abolished as the legislature may see fit."

There is no express provision of the *Constitution* which would be a limitation on the right of the Legislature to create the Workmen's Compensation Board and to provide for the appointment and removal of its members, with or without cause. I am not now concerned with the propriety or advisability of the action, but merely with its validity on the part of the Legislature.

As there is no express limitation in the *Constitution* on the power of the Legislature in the matter under discussion, so I find no implied limitation. It is certain that the Legislature has, a number of times, created offices and given the appointing power to a specified person, leaving to that person full power to regulate or remove the officer. Pointing to only one instance it appears that at the session of the Legislature next following the creation of the Workmen's Compensation Board (viz. 1919) the Legislature authorized the Attorney-General to appoint five important officers, viz.: A chief deputy and four other deputies. As to one it was expressly provided that he should hold office "at the pleasure of the Attorney-General." As to the others it was provided that "the term of office and the duties by them to be performed shall be determined and fixed from time to time by general or special appointments, regulations, and orders made by the Attorney-General." 30 *Del. Laws, c.* 48.

Here was a plain case of right of removal and it is a curious coincidence that, under the act just cited, among the first appointments as deputies by the Attorney-General with plenary power to regulate the term of office and to remove, one was the present Attorney-General who now is the relator, and two others have direct connection with the solution of the present question.

The very act now under discussion, *Workmen's Compensation Law,* when it was originally presented in the Legislature provided that the board should be appointed by the court and that the court had the power to remove the mem-

bers of the board "with or without cause." An amendment changed the appointing power from the court to the Governor. If the act had been adopted as originally introduced, I know of no limitation on the Legislature which would have rendered the law unconstitutional. For the same reason I see no prohibition merely because the Legislature changed the appointing power.

If it be assumed then that the Legislature could validly grant to an Attorney-General the right to fill offices and to remove the incumbents "with or without cause," and if the Legislature could validly grant to a court the right to appoint members of the Industrial Accident Board and the right to remove "with or without cause" (as was the present act as originally introduced), then I see no new and sudden unconstitutionality when the appointing power is changed to the Governor. The Governor represents the highest office in the gift of the people of a state. Is it to be assumed by some mere inference or implication that he is to be reduced below the level of any other appointive power in the state, and that the Legislature is without authority to grant to the Governor some special grant of power of removal which it can grant to any other appointive power in the state? To me this is so contrary to reason as only to be supported by an express constitutional provision or inescapable inference.

To me it seems that the powers of the Governor to make appointments and the provision as to his removal of officers as expressly set out in the *Constitution,* represent the irreducible minimum from which the Legislature can in no way detract. The powers as to the removal of officers vested by the *Constitution* in the Governor are grants of power to the Governor without which the Governor would have no power to remove at all. Without these provisions the Legislature alone would have plenary power by the *Constitution* to authorize any removal at any time it saw

fit. The provisions for grant of power in the Governor are limitations on the legislative powers to that extent, and to that extent only, for the limitation on the Legislature is exactly measured by the power taken from the representatives of the people (the Legislature) and vested in the Governor. The limitation is exactly equalled by the grant of power. What is not granted is reserved in the people acting through the Legislature. The powers vested in the Governor are not expressive of future and other powers which the Legislature might grant as to new statutory offices created by the Legislature. As to these, the Legislature has exclusive control.

It has been suggested by the majority opinion that if a vacancy on the Industrial Accident Board should happen during a recess of the Senate that, in such case, the Governor would appoint a successor pursuant to the provisions of *Article* 3, § 9, by granting a commission which would expire at the next session of the Senate. Inference is then drawn that the Governor could not remove such appointee except in the manner provided by the *Constitution,* and it is concluded that, during the recess of the Senate, the Governor can make no appointments except by granting commissions to expire at the next session of the Senate. Such argument, of course, has force in ordinary offices of fixed terms and in the present case would be material if the members of the Industrial Accident Board held fixed terms.

The argument loses its force when applied to an office at will or at pleasure, and this may best be shown by the analogous constitutional provisions concerning the secretary of state. By *Article* 3, § 10, the Governor appoints, with the consent of the Senate, a secretary of state "who shall hold office during the pleasure of the Governor." If a vacancy occurred in the office of secretary of state immediately upon the adjournment of the Legislature could it reasonably be argued that the succeeding appointee would

then have a fixed right to the office for the two years next ensuing and until the next session of the Senate? If this was true then the constitutional term of the secretary of state "at the pleasure of the Governor" would be an idle phrase and mean nothing.

In my opinion the entire provision concerning commissions to fill vacancies expiring at the next session of the Senate has applications to vacancies in offices for fixed terms and has no application to either constitutional or statutory offices where the term is one at pleasure or at will.

I am of the opinion that the plain and explicit will of the Legislature as expressed in the act under discussion, by the language "The Governor may remove any member of said Board with or without cause" *Rev. Code* 1935, § 6093, must and should be given consideration; that under said act the Governor had the right to remove those officers which he did remove. I am further of the opinion that the statute was a valid exercise of legislative power.

Any belief that I might, personally, hold as to the advisability or inadvisability of a statute giving to a Governor the right to remove without cause has nothing whatever to do with the present matter, and is entirely separate and distinct from its legal aspect.